GAY CROSTHWAIT GRUNFELD – 121944
LISA ELLS – 243657
KARA J. JANSSEN – 274762
MARC J. SHINN-KRANTZ – 312968
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email: lells@rbgg.com

MICHELLE IORIO – 298252
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, California  94704
Telephone:    (510) 665-8644
Facsimile:    (510) 665-8511
TTY:          (510) 665-8716
Email:        miorio@dralegal.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DAVID COLE, LEROY BENJAMIN, ERASMO FLORES, JR., ROBERT PHILLIPS and BRANDON WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>                 Plaintiffs,<br><br>          v.<br><br>COUNTY OF SANTA CLARA, a public entity, COUNTY OF SANTA CLARA DEPARTMENT OF CORRECTION, a public entity under the control of the County of Santa Clara, the COUNTY OF SANTA CLARA OFFICE OF THE SHERIFF, a public entity under the control of the County of Santa Clara, and DOES 1 to 20, inclusive,<br><br>                 Defendants. | Case No. 5:16-cv-06594-LHK<br><br>**CLASS ACTION**<br><br>**DECLARATION OF LISA ELLS IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**<br><br>Judge:  Hon. Lucy H. Koh<br><br>Trial Date:      None Set |

I, Lisa Ells, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of the parties' Joint Motion For Preliminary Approval Of Class Settlement.

2.      On November 13, 2018, the parties filed a Joint Motion for Settlement for Preliminary Approval of Class Action Settlement (Dkt. No. 66).  On December 6, 2018, this Court indicated that the Court would grant preliminary approval of the settlement but ordered the parties to correct one typographical error in the Consent Decree and to make certain changes to the Notice as requested by the Court and agreed upon by the parties, both previously filed at Dkt. No 66-1.

3.      Attached as **Exhibit 1** is a corrected version of the Consent Decree.  The parties have made no substantive changes to the Consent Decree.  The only changes that the parties have made to the Consent Decree are as follows: (1) the parties corrected a typographical error referencing 28 U.S.C. §§ 3626 (b), (e), and (f) in Section VII to now read 18 U.S.C. §§ 3626 (b), (e), and (f); and (2) the parties have put the Consent Decree on pleading paper with an appropriate caption page.  Additionally, the Consent Decree filed herewith includes as **Exhibit B** the revised Notice referenced above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 7th day of December, 2018.


*/s/ Lisa Ells*
Lisa Ells

DECLARATION OF LISA ELLS IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

# Exhibit 1

MICHELLE IORIO – 298262
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, California  94704
Telephone:   (510) 665-8644
Facsimile:    (510) 665-8511
TTY:          (510) 665-8716
Email:        miorio@dralegal.org

GAY CROSTHWAIT GRUNFELD – 121944
LISA ELLS – 243657
KARA J. JANSSEN – 274762
MARC J. SHINN-KRANTZ – 312968
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
Email:        lells@rbgg.com

Attorneys for Plaintiffs

JAMES R. WILLIAMS – 271253
  County Counsel
DOUGLAS M. PRESS – 168740
  Assistant County Counsel
ARYN PAIGE HARRIS – 208590
  Deputy County Counsel
EMILY L. FELDMAN – 271200
  Deputy County Counsel
OFFICE OF THE COUNTY COUNSEL
70 West Hedding Street
East Wing, Ninth Floor
San Jose, California  95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| DAVID COLE, LEROY BENJAMIN, ERASMO FLORES, JR., ROBERT PHILLIPS and BRANDON WILLIAMS, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>COUNTY OF SANTA CLARA, a public entity, COUNTY OF SANTA CLARA DEPARTMENT OF CORRECTION, a public entity under the control of the County of Santa Clara, the COUNTY OF SANTA CLARA OFFICE OF THE SHERIFF, a public entity under the control of the County of Santa Clara, and DOES 1 to 20, inclusive,<br><br>                Defendants. | Case No. 5:16-cv-06594-LHK<br><br>**CLASS ACTION**<br><br>**[PROPOSED] CONSENT DECREE**<br><br>Judge:   Hon. Lucy H. Koh |

This Consent Decree is made and entered into by and through Plaintiffs David Cole, Leroy Benjamin, Brandon Williams, Robert Phillips, and Erasmo Flores, Jr., individually and on behalf of the Plaintiff Class (as defined below) (collectively, "Plaintiffs"); and Defendant County of Santa Clara.[1]  Hereinafter, Plaintiffs and Defendant are referred to collectively as "the Parties."  This Consent Decree operates in conjunction with the related Mobility Disability Remedial Plan ("Remedial Plan"), attached hereto as **Exhibit A**, that is hereby fully incorporated into this Consent Decree by reference herein.

I.      **Recitals**

  A.      WHEREAS, after a series of arms-length settlement discussions, including significant exchanges of information and multiple proposals and counterproposals, as well as consideration of the risks, possible delays, and expense likely to result from prolonged litigation, the Parties have reached agreement on the terms of a proposed class settlement.

  B.      WHEREAS, this Consent Decree resolves the lawsuit filed on November 14, 2016, entitled, *Cole v. County of Santa Clara,* United States District Court, Northern District of California, Case Number 3:16-cv-06594 LHK (hereinafter, "Action") alleging that Defendant has discriminated against individuals with mobility disabilities incarcerated in Santa Clara County's ("the County") Main Jail North, Main Jail South, and Elmwood Correctional Facility (collectively, "the Jails") in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; Section 504 of the Rehabilitation Act ("Rehabilitation Act"); 29 U.S.C. § 794; and California Government Code Section 11135 ("Section 11135") (collectively, "State and Federal Disability Laws").  Defendant denies all of the allegations against it.

---

[1] Defendant here was erroneously sued as Defendant County of Santa Clara, the Santa Clara County Department of Correction, and the Santa Clara County Sheriff's Office.

**C.**    WHEREAS, Defendant reports that since the Parties began negotiations related to this lawsuit in January 2015, Defendant has already taken significant steps towards remediation, including but not limited to:

1.    Budgetary allocation of over $100 million dollars to ADA jail improvements (not including the planned New Jail facility, which the County plans to build on the current Main Jail South location);

2.    The completion of a number of other ADA improvements, including:

   a.    Construction of a number of ADA-accessible cells, housing units, restrooms, showers, and countertops, among other improvements;

   b.    Modification of the booking area and process to better accommodate ADA inmates;

   c.    The use of a screening tool to identify and assess inmates' Mobility Disabilities upon intake;

3.    The County's ongoing review and revision, as needed, of all Jail policies, procedures, Post Orders, and forms to address ADA compliance issues;

4.    Establishment of an ADA Coordinator and ADA Unit at an ongoing annual cost of $1,083,000;

5.    Procurement of an ADA electronic tracking system costing $283,000;

6.    Establishment of an electronic ADA Grievance System.

Plaintiffs have not confirmed these representations and maintain that Defendant is not currently in compliance with the relevant disability access laws.

**D.**    WHEREAS, through this Consent Decree, Defendant agrees to implement the measures set forth in the Remedial Plan (**Exhibit A**), subject to monitoring and, if necessary, enforcement by this Court as set forth in this Consent Decree.

**E.**    WHEREAS, by entry into this Consent Decree, the Parties intend to, and hereby do, resolve all claims that were actually, or could have been, raised in the Action by Plaintiffs and the Plaintiff Class.  The Parties believe this Consent Decree is fair, reasonable, and adequate to protect the interests of all Parties.

**F.**    WHEREAS, the Parties stipulate that this Consent Decree complies in all respects with the provisions of 18 U.S.C. § 3626(a).  The Parties further stipulate and agree, and the Court finds, that the prospective relief in this Consent Decree is narrowly drawn, extends no further than necessary to correct the violations of federal rights agreed to by the parties, is the least intrusive means necessary to correct those violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.

## II.    Definitions

The following definitions will apply to the terms of this Consent Decree and the Remedial Plan (**Exhibit A**). The following definitions are intended to be interpreted consistent with State and Federal Disability Laws.  Unless explicitly stated to the contrary, any term not expressly defined in this Section or elsewhere in this Consent Decree or Remedial Plan that has an expressly defined meaning under State and Federal Disability Laws, shall have the meaning ascribed to it by current statute.

This Remedial Plan uses the phrase, "Reasonable Modifications," pursuant to 28 C.F.R. § 35.130(b)(7), the Department of Justice regulations implementing Title II of the ADA; while the phrase, "reasonable accommodation," is primarily in Title I of the ADA, *see* 42 U.S.C § 12111.  The terms are frequently used interchangeably by the courts.

All other terms shall be interpreted according to their plain and ordinary meaning:

**A.**    "ADA Accessible" means and refers to a facility, or any portion thereof, which meets the following standards:  the current edition, as of the commencement of physical construction or alterations, of the California Building Code, Title 24, Part 3 of the California Code of Regulations; or, the

2010 Americans with Disabilities Act Standards for Accessible Design ("2010 ADA Standards"), which consist of the Title II regulations at 28 C.F.R. part 35.151 and the 2004 ADA Accessibility Guidelines ("ADAAG") at 36 C.F.R. part 1191, appendices B and D (hereinafter collectively, "Accessibility Standards").  In the event of conflict between the standards, Defendant will use the standard which provides the greater level of access.

**B.**   "ADA Tracking System" means a computerized, networked, real-time tracking system to enable Defendant to document and internally share information regarding inmates with a Mobility Disability.

**C.**   "Jails or Jail" means the jails operated by the Santa Clara County Department of Correction/Sheriff's Office Custody Division during the Term of the Consent Decree; and shall include the Main Jail Facility (consisting of Main Jail North and Main Jail South, collectively, "Main Jail"); and the Elmwood Correctional Facility, which includes the Correctional Center for Women or CCW (collectively, "Elmwood"); and the proposed New Jail.

**D.**   "The County" means Santa Clara County, the Santa Clara County Department of Correction, and the Santa Clara County Sheriff's Office, and the agents and employees of the Department of Correction, the Sheriff's Office, and the County agents and employees who provide health care to inmates.

**E.**   The following terms govern monitoring:

1.   "Substantial Compliance" shall be interpreted to be consistent with Ninth Circuit law defining "substantial compliance" in the context of implementing consent decrees and similar court-supervised settlements; as such, substantial compliance will mean compliance with the essential requirements of the Remedial Plan that satisfies the Remedial Plan's overall purposes and objectives and adherence to the provisions of the Remedial Plan in all material respects, recognizing

that perfection is not required.  Under Ninth Circuit law, non-systemic or unintentional deviations that are so minor or trivial as to not substantially defeat the object of the Remedial Plan shall not prevent a finding of substantial compliance.

2. "Unratable-In Progress" shall mean that Defendant has identified, and the applicable monitor agrees, that remediation efforts concerning certain material provisions of the Remedial Plan are not yet complete.

3. "Non-Compliance" shall mean that Defendant has not met most of the material components of the relevant provision of the Remedial Plan.

**F.** "Adult Custody Health Services Staff" includes all County employees who work in the Jails for Adult Custody Health Services and who have more than incidental contact with inmates.

**G.** "Custody Staff" includes all County employees who work in the Jails for the Custody Bureau, including correctional officers/deputies, who have more than incidental contact with inmates.  This does not include County employees whose duties relate solely to facility maintenance (i.e., electricians, janitors, food service staff).

**H.** "Days" refers to calendar days unless otherwise specified.

**I.** "Describe" means to provide a clear and detailed description of something done, experienced, seen, or heard.

**J.** "Document," when used in this Consent Decree as a verb, means completing a record of information either in hard copy or electronic format.

**K.** "Effective Date" means the date the Court grants approval of this Consent Decree.

**L.** "Execution Date" means the date the Parties execute this Consent Decree.

**M.** To "implement" a policy means that the policy has been drafted and distributed to all staff responsible for following or applying the policy; and, if expressly required under this Consent Decree, all relevant staff have been

trained on the policy; compliance with the policy is monitored and tracked, if practical, to assure the policy is consistently applied; and the County will adopt corrective action measures to address any lapses in application of the policy.

**N.**   "Include" or "including" means "include, but not limited to" or "including, but not limited to."

**O.**   "Levels" means an inmate's classification level.  The County assigns inmates security levels 1-4.  Level 1 is the lowest level of security and Level 4 is the highest.  The County may adopt a high, medium, minimum security classification model.  In the event this occurs, the Parties agree that Level 4 is high; Level 3 and Level 2 are medium, and Level 1 is minimum.

**P.**   "Medical Provider"  means a County medical doctor, doctor of osteopathy, physician assistant, or nurse practitioner.

**Q.**   "Mobility Device" means any non-motorized device designed for use by inmates with Mobility Disabilities such as wheelchairs, crutches, walkers, canes, braces, or other similar devices.  The limited circumstances for issuance of a motorized wheelchair are addressed in Section IV(B)(2), below.  There are three types of Mobility Devices referenced throughout the Remedial Plan:  (a) "Standard," which refers to wheelchairs, walkers, crutches, and canes that are owned and maintained by the County; (b) "Generic," which refers to Mobility Devices, excluding the devices listed in subsection (a), that the County may have readily available or that can be easily procured as an off-the-shelf generic durable medical good (including, but not limited to, a splint, boot, brace, sling, and/or wedge support); and (c) "Customized," which refers to a Mobility Device that requires custom specifications to meet the needs of an inmate (including, but not limited to, prosthetics, certain orthotics, and some wheelchairs).  "Personal" Mobility

Devices refers to a Mobility Device brought into the Jails by an inmate.  All other devices referred to herein are owned and issued by the County.

**R.**    "Mobility Disability" and "Mobility Disabilities" means an impairment that affects an inmate's ability to move physically and which substantially limits the inmate's ability to perform one or more major life activities, including but not limited to standing, lifting, stooping, and/or ambulating.

**S.**    "Plaintiffs" and "Plaintiff Class" mean all individuals with a Mobility Disability who are now, or will be in the future, for the Term of this Consent Decree incarcerated in the County Jails.

**T.**    "Plaintiffs' Counsel" means Disability Right Advocates ("DRA") and Rosen Bien Galvan & Grunfeld, LLP ("RBGG").

**U.**    "Inmate(s)" shall be construed broadly to refer to one or more individuals incarcerated at, detained at, or otherwise housed, held, in the custody of, or confined at the Jails, including transportation.

**V.**    "Safety-Security Assessment" means an individualized safety-security assessment that shall be based on reasonable judgment that relies on the best available objective evidence, to ascertain (1) the nature, duration, and severity of any risk, (2) the probability of potential injury, and (3) whether providing an alternative Mobility Device and/or reasonable modification would mitigate the risk.  In no case shall a Mobility Device be removed based solely on the nature of the inmate's criminal charges or convictions.

**W.**    "Staff" includes all full-time, coded employees who are employed by the County of Santa Clara and work in the Jails.

**X.**    "Train" means to instruct in the skills addressed to a level at which the trainee has the demonstrated competency to implement those skills as, and when called for, in the training.  "Trained" means a demonstration of staff competency.

NOW, THEREFORE, FOR AND IN CONSIDERATION OF the mutual covenants

and conditions set forth herein, the Parties hereto agree as follows:

**III.     Injunctive Relief**

The Parties' Remedial Plan outlining the injunctive provisions is attached hereto as **Exhibit A** and fully incorporated by reference herein.

**IV.     Settlement Approval Process**

    **A.**    The Parties will agree on a joint motion and will jointly move the Court, by November 13, 2018, for an Order granting Preliminary Approval of this Consent Decree and setting a hearing for Final Approval of this Consent Decree.

    **B.**    The Parties will negotiate and draft a proposed notice to the Class, which shall include the terms of this Consent Decree and their right to object thereto.  The Parties will make any edits or modifications to the draft notice should such edits or modifications be directed by the Court.  The proposed notice shall be attached to and incorporated into this Consent Decree as **Exhibit B.**

    **C.**    The Parties shall develop a plan for posting the notice.  At a minimum, the notice plan shall include the following:  (1) posting notice in all intake, housing, and programming units of the Jails; (2) posting notice on Plaintiffs' Counsels' websites; and (3) posting notice on the television-notification system inside the Jails.  All postings will be in accessible formats.  The Parties will provide alternate format copies of the notice upon request. Notice will be posted/distributed by the Parties within twenty-one (21) days of the date of the Court's Order granting preliminary approval, and shall remain posted for no less than thirty (30) days.  The Parties will submit declarations to the Court as part of the motion for final approval confirming that notice has been issued according to this paragraph.

    **D.**    Defendant shall provide notice as required by the Class Action Fairness Act (28 U.S.C. §§ 1711-1715) to appropriate officials as required by that Act.

**E.**    The Parties will take all procedural steps regarding the fairness hearings as may be requested by the Court and will otherwise use their respective best efforts to consummate the agreement set forth in this Consent Decree, and to obtain final Court approval of this Consent Decree and entry of Judgment.

**F.**    If, for any reason, the Court does not approve this Consent Decree, the executed Consent Decree shall be null and void.

**G.**    Upon final approval by the Court, this Consent Decree will be binding upon the Defendant, Plaintiffs, and all Class members and will constitute the final and complete resolution of all issues addressed herein.

## V.    Roles of Monitor and Plaintiffs' Counsel

**A.**    Role of Plaintiffs' Counsel

   1.    Jail Facility Tours

      a.    Defendant shall permit Plaintiffs' Counsel reasonable access to tour the jail facilities, interview staff and inmates, and observe practices related to Defendant's compliance with the provisions of this Consent Decree.  Plaintiffs' Counsel shall have reasonable access to interviews of staff and inmates to ensure a full evaluation.  Interviews with inmates shall be conducted confidentially.  Interviews with staff shall be conducted outside the presence of other jail staff or supervisors.  However, County Counsel shall be present during staff interviews and staff may decline to participate in any interview conducted by Plaintiffs' Counsel.

      b.    Plaintiffs' Counsel's tours will not exceed more than three (3) tours annually.

      c.    Each tour shall last no more than two (2) days and be conducted by no more than one (1) Plaintiffs' attorney or, alternatively, one (1) staff member.  Plaintiffs' representative

1    shall debrief with County Counsel at the end of each tour.

2    Plaintiffs' Counsel shall also write a report after each tour, to

3    which Defendant may respond within 21 days.  Plaintiffs'

4    Counsel will provide Defendant's counsel with 7 days advance

5    notice of tour.

6    2.    Requests for Documents and Individual Advocacy

7          a.    Defendant shall provide Plaintiffs' Counsel with access to

8                records, reports, and documents that the Parties agree and

9                identify are necessary to evaluate Defendant's ongoing

10               compliance with the Remedial Plan.  If the Parties cannot agree

11               on the necessary documents, the Parties will meet and confer to

12               address any disagreements.  The Parties shall cooperate so that

13               such access is provided without unduly burdening Defendant.

14               Defendant shall provide Plaintiffs' Counsel with such

15               information within 14 days of the request, unless a longer

16               period of time is necessary.

17         b.    Where Plaintiffs' Counsel has a good faith basis for doing so,

18               Plaintiffs' Counsel may bring individual inmates' disability

19               accommodation concerns to the attention of the County in

20               writing, who shall respond in writing within 14 days.  This

21               process is not meant to replace or circumvent the existing

22               processes for submitting grievances or ADA requests to jail

23               staff.  Plaintiffs' Counsel will encourage inmates to make use

24               of those existing processes except where exigent circumstances

25               or failures of those processes have occurred.

26   3.    Periodic Reporting

27         a.    Defendant will provide Plaintiffs' Counsel with the following

28               reports:  (a) a monthly report from the ADA Tracking System,

identifying all inmates with Mobility Disabilities and the accommodations received, where the inmates are housed, and to which programs the inmates are assigned; (b) on a triannual basis, copies of all ADA-related inmate grievances and the written responses to the inmate grievances; and (c) on a triannual basis, copies of all ADA-related Inmate Request Forms and the written responses to these requests.

b. Production of the reports identified in subpart (a) of this provision is derived from the current ADA Tracking System, and the Parties acknowledge that the current ADA Tracking System is not integrated with the electronic medical record or other custody-based electronic systems and, thus, there are information sharing challenges that will not be cured until Defendant implements the planned electronic jail management software.

c. Within 30 days of the Effective Date of the Consent Decree, the Parties shall meet and confer to determine a list of any additional documents necessary for Plaintiffs' Counsel to evaluate Defendant's compliance with the Remedial Plan that will be produced on a periodic basis as well as the frequency for such productions.

**B.    Monitoring by Operational Monitor**

1. Within three months of the execution date, the Parties shall jointly agree upon a Monitor ("Operational Monitor") who will monitor Defendant's compliance with the operational aspects of the Remedial Plan for the Term of this Consent Decree.

2. If, for any reason, the Operational Monitor can no longer serve or the Parties jointly wish to engage a different monitor, the Parties shall

attempt to agree on who shall be appointed to serve as the replacement monitor.

3.   If the Parties are unable to agree on the replacement monitor, the Parties shall each submit a list of two (2) proposed new Operational Monitor candidates, all of whom will have already agreed to be subject to, and comply with, the Defendant's contracting requirements, to the Honorable Magistrate Judge Nathaneal Cousins. Prior to submitting their respective lists to Judge Cousins, the Parties agree to meet and confer to ensure that each proffered candidate is eligible to be considered.  If a proposed candidate is found to be ineligible due to his or her inability or unwillingness to comply with the County's contractual requirements or due to a conflict of interest, the Party who proposed that candidate will be given an opportunity to propose an alternative candidate for consideration.  The Parties will submit written suggestions to Judge Cousins as to who to select from the lists.  Judge Cousins shall then select the new Operational Monitor from the lists.

4.   Once the Operational Monitor is selected, the Operational Monitor will conduct two tours within the first year of the Execution Date of the Consent Decree and thereafter conduct biannual tours and program reviews.  Plaintiffs' Counsel shall have the right to attend the tours.  The Parties may jointly agree in writing to conduct operational monitoring on a less frequent basis if the Parties agree such reduction is appropriate based on the current circumstances.

5.   Prior to the Operational Monitor's visit, Defendant shall advise the Operational Monitor which subjects are Unratable-In Progress and provide a brief reason why the subject(s) is not ready for evaluation of Substantial Compliance/Non-Compliance.  The Operational Monitor

shall still have the right to review the status of subjects Defendant has declared to be Unratable-In Progress.

6. The Operational Monitor will prepare a written report within 45 days after monitoring that will evaluate the extent to which Defendant has successfully implemented substantive provisions of the Remedial Plan and any plans to effectuate its terms, and recommend specific actions the Operational Monitor believes Defendant must make to achieve Substantial Compliance with the Remedial Plan. The Operational Monitor shall report on whether, as to each material provision, the County is in Substantial Compliance, Unratable-In Progress, or Non-Compliance as those terms are defined herein.

7. The Parties will have twenty-one (21) days to make written comments or objections to the Operational Monitor report. The Operational Monitor shall have twenty-one (21) days to respond to the Parties' comments or objections by issuing a final report.

8. The Operational Monitor will conduct three tours of the New Jail unless the Parties agree that a third tour is unnecessary. The Operational Monitor will conduct the first tour of the New Jail within thirty (30) days after the County begins occupancy of the New Jail. The Operational Monitor will conduct the second tour of the New Jail as soon as he or she determines that there are sufficient numbers of inmates housed at the Jail to allow a meaningful evaluation of the New Jail's compliance with this Consent Decree, to the extent that has not occurred at the time of the first tour. The Operational Monitor will conduct a third tour unless the Parties agree that a third tour is unnecessary. The Operational Monitor will prepare a written report within thirty (30) days after each tour that will evaluate the extent to which Defendant has successfully implemented substantive provisions

of the Remedial Plan in the New Jail and any plans to effectuate its terms, and recommend specific actions that the Operational Monitor believes Defendant may need to make, if any, to achieve Substantial Compliance with the Remedial Plan. The Operational Monitor shall report on whether, as to each material provision, the County is in Substantial Compliance, Unratable-In Progress, or Non-Compliance, as those terms are defined herein. The Parties will have fourteen (14) days to make written comments or objections to this report. The Operational Monitor shall have fourteen (14) days to respond to the Parties' comments or objections by issuing a final report.

C.   **Monitoring of Physical Alterations to Current Jails**

1.   Within three months of the Execution Date, the Parties shall jointly agree upon a Monitor with architectural accessibility expertise ("Architectural Monitor") who will monitor Defendant's compliance with the physical access portion of the Remedial Plan in the context of construction and/or alterations to the Jails for the duration of the Term of this Consent Decree.

2.   If, for any reason, the Architectural Monitor can no longer serve or the Parties jointly wish to engage a different monitor, the Parties shall attempt to agree on who shall be appointed to serve as the replacement monitor.

3.   If the Parties are unable to agree on the replacement monitor, the Parties shall each submit a list of two (2) proposed new Architectural Monitor candidates, all of whom will have already agreed to be subject to, and comply with, the Defendant's contracting requirements, to the Honorable Magistrate Judge Nathaneal Cousins. Prior to submitting their respective lists to Judge Cousins, the Parties agree to meet and confer to ensure that each proffered candidate is

eligible to be considered.  If a proposed candidate is found to be ineligible due to his or her inability or unwillingness to comply with the County's contractual requirements or due to a conflict of interest, the Party who proposed that candidate will be given an opportunity to propose an alternative candidate for consideration.  The Parties will submit written suggestions to Judge Cousins as to who to select from the lists.  Judge Cousins shall then select the new Architectural Monitor from the lists.

4.  Defendant has provided and continues to provide the Architectural Monitor with copies of architectural drawings ("plans") for construction and/or physical alterations within the Jails covered by the Remedial Plan.

5.  Defendant may consult directly with the Architectural Monitor regarding the plans and/or alterations for the Jails.  If Defendant and the Architectural Monitor have a dispute regarding the plans and/or alterations for the Jails, or reach a determination that technical infeasibility exists, Defendant shall advise Plaintiffs of these communications.

6.  The Parties may agree to exclude specific projects from the plan review requirements.

7.  Defendant anticipates that the planned construction will be completed in January 2022 at the earliest.  The planned construction is highly dependent on third-party contractors, and this time estimate is not binding.

8.  Defendant will request that the Architectural Monitor conduct periodic site visits to review completed work as major projects or groups of projects are completed.  Plaintiffs' Counsel may accompany the Architectural Monitor on these visits.  The Architectural Monitor

1  shall confirm in a written report, provided to the Parties within 45
2  days, whether each part of the completed work is ADA Accessible.

3     9.   The Parties will have twenty-one (21) days to provide written
4  comments or objections to the Architectural Monitor's report.  The
5  Architectural Monitor shall have twenty-one (21) days to respond to
6  the Parties' comments or objections by issuing a final report.

7     10.   Once the physical alteration projects are complete, the Architectural
8  Monitor determines compliance, and the Dispute Resolution Process,
9  if applicable, is complete, Defendant is no longer subject to
10  monitoring for physical alterations.

11  **D.**   **Monitoring of Construction of the New Jail**

12     1.   Defendant anticipates that the New Jail will be completed in 2023.
13  Construction of the New Jail is highly dependent on third-party
14  contractors, and this time estimate is not binding.

15     2.   After construction of the New Jail, the Architectural Monitor will
16  conduct a site visit within thirty (30) days of completion of
17  construction on the New Jail, and prepare a written report provided to
18  the Parties within forty-five (45) days, evaluating whether each part of
19  the completed work is ADA Accessible as required under the
20  Remedial Plan.  Plaintiffs' Counsel may accompany the Architectural
21  Monitor on this site visit.

22     3.   The Parties will have twenty-one (21) days to provide written
23  comments or objections to the Architectural Monitor reports.  The
24  Architectural Monitor shall have twenty-one (21) days to respond to
25  the Parties' comments or objections by issuing a final report.

26  **VI.**   **Attorney's Fees and Costs**

27  **A.**   No later than ninety (90) days after the Effective Date, the County agrees to
28  pay Plaintiffs' Counsel the fixed sum of $1 million to cover and fully resolve

any and all of Plaintiffs' and Plaintiffs' Counsels' claims against the County for attorney's fees and costs incurred or attributable to any and all work from any time prior to the filing of this Action (including any claims from the structured negotiations phase), up through and including the Effective Date of this Consent Decree (hereinafter, "past fees").

**B.**   No later than ninety (90) days after the Effective Date, the County shall pay the fixed sum of $2.2 million to cover and fully resolve any and all of Plaintiffs' and Plaintiffs' Counsels' claims against the County for attorney's fees and costs incurred or attributable to any and all work performed by anyone from the Effective Date of this Consent Decree up through and including the end of the Term, as Term is defined in Section VIII (hereinafter, "future fees").  These future fees shall be paid, using wire instructions stated at Section VI.B.1, into the Cole Jail Monitoring Qualified Settlement Fund ("QSF"), established by or on behalf of Plaintiffs' Counsel. Plaintiffs' Counsel warrants and represents to the County that the QSF is a duly constructed and authorized Internal Revenue Code Section 468B Qualified Settlement Fund, as defined by Internal Revenue Code Section 468-B and the associated Treasury Reg. 1.468B-1 of the Internal Revenue Code, and is qualified to receive this settlement payment for future fees. Plaintiffs' Counsel shall defend and indemnify the County, and hold the County harmless, with respect to any claims, demands, causes of action, suits, debts, liabilities, fees, taxes, charges, losses, or costs, of any nature whatsoever, relating to or arising from the formation, administration, or existence of the QSF or the payment by the County into the QSF.

1.   The following, in combination with the complete account number which shall be provided by Plaintiffs' Counsel to the County, constitute the wire instructions for the QSF:

- Account Name:  EPTC Custodial Trust Settlement Trust Contribution Account
- Account Number:  X8544
- Bank:  Union First Market Bank
- Routing Number:  051403164
- Further Credit Instructions:  EPTC FBO – Cole Jail Monitoring Qualified Settlement Fund

2. The only exceptions to this fixed sum for future fees that are not included in the $2.2 million sum, above, are comprised of the following two scenarios; and these are the only situations in which Plaintiffs' Counsel or anyone else may file a motion with the court seeking an award of additional reasonable attorney's fees and costs:

a. The County brings an unsuccessful motion under the Consent Decree against Plaintiffs or Plaintiffs' Counsel ("County's Motion") (Scenario 1); or

b. The Court has found the County to be in violation of provisions of the Consent Decree, and based on that violation, has ordered to County to comply with the Consent Decree ("order to comply"); and then, the County refuses to follow that order to comply (Scenario 2).

c. Under Scenario 1, Plaintiffs' Counsel may only be awarded those reasonable attorney's fees and costs for work performed that both a) arises after the filing of the County's Motion and b) directly pertains to Plaintiffs' Counsel preparing their filed response and attending the hearing, if any, on the County's Motion.

d. Under Scenario 2, if the County refuses to follow the order to comply, Plaintiffs' Counsel may file a motion to find the

County in contempt of court.  If Plaintiffs' motion is successful, Plaintiffs' Counsel may then only be awarded those reasonable attorney's fees and costs for their work drafting and arguing the successful new contempt motion that is performed after both a) the Court enters the order to comply, and then b) the County fails to abide by that order to comply.

C.   With the exception of the scenarios set forth in Section VI.B.2, no other attorney's fees or costs award or payment of any sort is permitted to anyone under this Consent Decree.

## VII.   Dispute Resolution

A.   If either Party seeks to engage in the Dispute Resolution Process, as defined herein, that Party shall give notice to the other Party of the grounds for the dispute.  The Party receiving the demand to engage in the Dispute Resolution Process will provide a written response within fourteen (14) days.  The Parties shall then engage in good-faith negotiations to attempt to resolve the dispute for a minimum of thirty (30) days from the date of the response. Plaintiffs shall be permitted to bring their own expert into the Jails, at a time, scope, and for a duration mutually agreed upon by the Parties, as part of this thirty (30) day negotiation period in order to assist in resolving the dispute. The County agrees to not unduly delay Plaintiffs' expert's access to the Jails under these circumstances.

B.   If after meeting and conferring for at least thirty (30) days, the dispute has not been resolved, either Party may request that the Parties bring the dispute before Judge Cousins, or another mutually agreed upon neutral, for purposes of mediation.  If Judge Cousins is not available within forty-five days (45), the Parties will utilize the services of the Northern District of California's Alternative Dispute Resolution program or request that the Court appoint another Magistrate Judge.  If this mediation is unsuccessful, either Party may

apply to the Court for relief that is bounded by and subject to the limitations and terms of this Consent Decree.  The Parties agree to work in good faith to avoid such applications wherever possible.  Any disputes that cannot be resolved through the Dispute Resolution Process outlined above may be submitted to Judge Cousins, in his capacity as a Magistrate Judge rather than as a mediator as delineated in Section IX.B. below, for a resolution that is bounded by and subject to the limitations and terms of this Consent Decree.

**C.**    During the last nine (9) months of the Term of this Consent Decree, either Party may choose to immediately submit any disputes to Judge Cousins following completion of the thirty-day meet and confer process, in his capacity as a Magistrate Judge, for a resolution that is bounded by and subject to the limitations and terms of this Consent Decree.

In the case of an emergency that poses an immediate and significant threat to the health and safety of inmates, and as such, the nature of the emergency makes completion of the Dispute Resolution Process impracticable, a Party may seek relief from the Court that is bounded by and subject to the limitations and terms of this Consent Decree, with the exception of not having to complete the Dispute Resolution Process, provided that the moving Party has notified the nonmoving party of the issue at least seventy-two (72) hours before seeking such relief from the Court.

## VIII.    Duration of the Consent Decree

**A.**    The Parties agree that this Consent Decree, and all of its terms, will expire, and will no longer be enforced or enforceable in any court, twelve (12) months after the certificate of occupancy for the New Jail has been issued and the County has begun placement of inmates in the New Jail (the "Term").  This Term is among the most material terms of this Consent Decree, such that absent this Term, the Parties would not have executed this Consent Decree.  To effectuate this Term, the Parties further agree to waive

their rights under 18 U.S.C. §§ 3626 (b), (e), and (f), including as set forth in paragraphs VIII.B and C, below.

**B.**     Defendant agrees not to seek, support, or assent to termination of the Consent Decree before the completion of the Term, under any circumstances, except as set forth in paragraph VIII.C, below; and Plaintiffs agree not to seek, support, or assent to any extension of the Term, under any circumstances, except as set forth in paragraph VIII.C, below.

**C.**     The only circumstance by which the Term of this Consent Decree may be extended is that the Parties jointly agree that the Term should be extended because they perceive that ongoing violations remain at the end of the Term and the Parties jointly agree that extension of the Term is the most efficient means to address such violations.  In that circumstance, the Parties will jointly move, and can only jointly move, the Court to extend the Term.  If Plaintiffs contend, and Defendant disputes, that ongoing violations exist at the end of the Term, and/or if Defendants do not agree that the Term should be extended, Plaintiffs' sole remedy shall be to file a new lawsuit after the end of the Term of this Consent Decree.

**IX.     Reservation of Jurisdiction and Enforcement**

**A.**     The District Court of the Northern District of California shall retain jurisdiction to enforce, but under no circumstances expand or alter, the terms of this Consent Decree and shall retain jurisdiction to resolve any dispute regarding compliance with this Consent Decree and that such resolution is bounded by and subject to the limitations and terms of this Consent Decree, including that in Section VIII, above, regarding the Term of this Consent Decree.  The Court shall have the power to enforce the Consent Decree through specific performance and all other remedies permitted by law and equity throughout the Term of this Consent Decree and that such enforcement is bounded by and subject to the limitations and terms of this

Consent Decree, including that in Section VIII, above, regarding the Term of this Consent Decree.

**B.**     The Parties consent to having all disputes between the Parties arising out of this Consent Decree, including those regarding compliance with this Consent Decree, heard and decided by Judge Nathanael Cousins, subject to the provisions of Federal Rule of Civil Procedure 72, and that any relief from such disputes is bounded by and subject to the limitations and terms of this Consent Decree.  Should Judge Cousins no longer be available to serve in this capacity for any reason, only this provision, IX.B, will be deemed to be severable from the remainder of this Consent Decree, unless the Parties jointly agree on a new decision-maker.

**X.     Release**

Subject to the entry of Judgment by the Court and in consideration of the relief set forth herein, Plaintiffs, for themselves, the Class, and their successors and assigns, hereby fully and finally release and discharge Defendant and its successors, assigns, officers, directors, and past and present agents and employees ("Released Parties") from any and all claims for declaratory or injunctive relief raised in the Action, or that could have been raised in the Action, relating to inmates with Mobility Disabilities ("Released Claims"). The Released Claims do not include any claims to enforce the terms of this Consent Decree.  Nothing in this Consent Decree releases any damages claims to which Plaintiffs or other individual members of the Plaintiff Class may be entitled.

**XI.     Miscellaneous**

**A.**     This Consent Decree, which incorporates by reference the Remedial Plan (**Exhibit A**) and the draft Notice to the Class (**Exhibit B**)**,** contains the entire agreement between the Parties.  This Consent Decree expresses the complete and final understanding with respect to the subject matter of this Consent Decree.  The Parties hereto understand and agree that the terms of this

Consent Decree supersede any prior discussions, understandings, or agreements between them related to the subject matter hereof.

**B.** The Parties each acknowledge that they are entering into this Consent Decree freely, knowingly, voluntarily, and with a full understanding of its terms. The Parties acknowledge that they have consulted with counsel of their own choosing concerning this Consent Decree and that they were given reasonable time to review and consider the terms of this Consent Decree.

**C.** This Consent Decree shall be binding on all successors, assignees, employees, agents, and all others working for or on behalf of Defendant and Plaintiffs.

**D.** The language of this Consent Decree shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties.  The terms of this Consent Decree are the product of joint negotiations and shall not be construed as having been authored by one party rather than another.  Any ambiguity shall not be construed against any Party.  Where required by context, the plural includes the singular and the singular includes the plural. The headings in this Consent Decree are solely for convenience and will not be considered in its interpretation.

**E.** If any provision or provisions of this Consent Decree, other than the Term, shall be held invalid, illegal, or unenforceable, the validity, legality, and/or enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**F.** This Consent Decree may be executed in counterparts, each of which will be considered an original, but all of which, when taken together, will constitute one and the same instrument.

**G.** This Consent Decree shall be governed by and construed in accordance with the laws of the State of California.

1

**H.**     To the extent any documents are required to be executed by any of the

2       Parties to effectuate this Consent Decree, each party hereto agrees to execute

3       and deliver such and further documents as may be required to carry out the

4       terms of this Consent Decree.

5

**I.**     Each signatory to this Consent Decree certifies that it, he, or she is fully

6       authorized by the party it, he, or she represents to enter into the Consent

7       Decree, to execute it on behalf of the party represented, and to legally bind

8       that party thereto.

9       Unless otherwise indicated in the Consent Decree, all notices or

10      communications required by this Consent Decree shall be in writing by email

11      addressed as stated below.  Should any Party's contact information change

12      from what is listed below, that Party shall promptly provide written notice of

13      the updated contact information to the other Parties.

14      To Named Plaintiffs, Plaintiffs' Counsel, or the Settlement Class:

15      Lisa Ells
        Rosen Bien Galvan & Grunfeld LLP
16      101 Mission Street, Sixth Floor
        San Francisco, CA  94105-1738
17      lells@rbgg.com

18      Michelle Iorio
        Disability Rights Advocates
19      2001 Center Street, Fourth Floor
        Berkeley, CA 94704
20      miorio@dralegal.org

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

To Defendant:

2

Douglas M. Press, Assistant County Counsel
Aryn Harris, Deputy County Counsel

3

Emily Fedman, Deputy County Counsel
70 West Hedding St., 9th Floor, East Wing

4

San Jose, CA 95110
douglas.press@cco.sccgov.org

5

aryn.harris@cco.sccgov.org
emily.fedman@cco.sccgov.org

6

7

**IT IS AGREED AND SO STIPULATED.**

8

DATED:  November 12, 2018          ROSEN BIEN GALVAN & GRUNFELD LLP

9

By:  */s/ Lisa Ells*

10

Lisa Ells

11

DATED:  November 12, 2018          DISABILITY RIGHTS ADVOCATES

12

By:  */s/ Michelle Iorio*

13

Michelle Iorio

14

Attorneys for Plaintiffs and the Plaintiff Class

15

16

DATED:  November 13, 2018          JAMES R. WILLIAMS
County Counsel

17

By:  */s/ Aryn Paige Harris*

18

Aryn Paige Harris
Deputy County Counsel

19

Attorneys for Defendant

20

21

22

23

24

25

26

27

28

# Exhibit A

**Santa Clara County Mobility Disability Remedial Plan**

## I.   TERMINOLOGY AND DEFINITIONS

The terms and definitions set forth in the Consent Decree, to which this Remedial Plan is attached and into which this Remedial Plan is incorporated by reference, also control the terms and definitions set forth in this Remedial Plan.

## II.   INTAKE PROCESS

A.   In a reasonably confidential setting, the County shall inquire during intake whether an inmate has a Mobility Disability using an agreed-upon screening tool.

B.   The intake screening shall be conducted by a licensed registered nurse or, at the County's discretion, a Medical Provider.

C.   During the intake screening, the County shall begin the verification process of whether an inmate has a Mobility Disability, as outlined in Section III, if:

1.   The inmate self-reports a Mobility Disability;

2.   The inmate's Healthlink or ADA Tracking System record contains documentation of a Mobility Disability; or

3.   The screening tool indicates that the inmate might have a Mobility Disability.

D.   If the intake process outlined in Section II.C, above, indicates that an inmate might have a Mobility Disability, the County shall utilize the agreed-upon screening tool to determine what type of reasonable modifications are necessary and available (e.g., changes to housing, lower bunk/lower tier) and shall provide such reasonable modifications while the inmate awaits verification pursuant to Section III.

E.   *Issuance and Retention of Mobility Devices at Intake*

1.   The County will issue a Standard Mobility Device promptly, but in any case no later than the timelines contained in Section IV, to any inmate who is determined to possibly need a Mobility Device pursuant to Section II.D, subject to later verification pursuant to Section III, unless a Captain or Watch Commander determines and documents, based on a Safety-Security Assessment, that an inmate's possession of a Mobility Device constitutes an immediate risk of

bodily harm to inmates or staff, or threatens the security of the facility.  If providing an alternative Mobility Device would mitigate the risk, the Captain or Watch Commander shall direct that the inmate be provided with the designated alternative.

2.     The County acknowledges its obligations to comply with California Penal Code section 2656 pertaining to retention of orthopedic and prosthetic appliances.

3.     Subject to Sections II.E.1 & II.E.2, inmates will be permitted to keep their Personal Mobility Device(s) during the intake process until the County issues a Standard or Generic (if available) Mobility Device, unless a Captain or Watch Commander determines and documents, based on a Safety-Security Assessment, that the Mobility Device constitutes an immediate risk of bodily harm to inmates or staff, or threatens the security of the facility.  If providing an alternative Mobility Device would mitigate the risk, the Captain or Watch Commander shall direct that the inmate be provided with the designated alternative.

F.     If an inmate arrives at the Jail with a Personal Mobility Device that is exchanged for a County-owned Mobility Device, the County shall store the Personal Mobility Device at the Jail at no cost to the inmate for return upon release and/or transfer from the Jail to another facility.  Alternatively, the inmate may arrange for pick-up of the Mobility Device.  The County will not store a Personal Mobility Device for more than ninety (90) days after an inmate has been released or transferred.

G.     The County shall advise inmates of the results of the intake screening and notify the inmate of the right to request a physical examination by a Medical Provider to the extent the inmate disagrees with the results and/or reasonable modifications provided.  The County shall further notify inmates of the right to request use of a Personal Mobility Device consistent with Section IV below.

H.     The results of the intake screening shall be documented and promptly inputted into the County's ADA Tracking System.

I.     As part of the intake process, all inmates shall be informed of the process by which they can request a reasonable modification while in custody, including the types of issues that can be reviewed by the County Jails' ADA Unit on an expedited basis.

## III.   VERIFICATION OF AN INMATE'S MOBILITY DISABILITY AND NEED FOR REASONABLE MODIFICATIONS

A.   The County's policy is to issue County owned Mobility Devices in all instances unless:  (a) an inmate's Personal Mobility Device is the only reasonable modification for the inmate's Mobility Disability; or (b) the nature of the inmate's Personal Mobility Device would pose particular difficulty and/or harm to the inmate to remove, and/or removal is otherwise unnecessary due to the origin or nature of the device (i.e., a hospital-issued sling or brace).

B.   An inmate may make a request to the ADA Unit to be able to continue to use his/her Personal Mobility Device.  The ADA Unit and/or Medical Provider (where necessary) will evaluate the request based on an individualized assessment as outlined in Sections III.D and III.E.

C.   An inmate's Personal Mobility Device may be retained by the County for a short period of time sufficient to inspect the device for contraband.  In most cases the inspection should occur promptly, but in rare cases the inspection may take longer, in which case it shall be completed within 14 days.

D.   *ADA Unit's Responsibilities*

1.   The County's ADA Unit shall review whether an inmate has a Mobility Disability and/or what reasonable modification(s) are necessary for the inmate within 7 calendar days under the following circumstances:

a.   An inmate is designated during the intake screening as possibly having a Mobility Disability and/or the need for a reasonable modification;

b.   An inmate makes a request to the ADA Unit, including through an ADA Request or ADA-related grievance as outlined in Section XIII, for evaluation of a Mobility Disability and/or the need for a reasonable modification; or

c.   The inmate is referred by staff to the ADA Unit for evaluation of a Mobility Disability and/or the need for a reasonable modification.

2.   The ADA Unit shall document a Mobility Disability and/or what reasonable modification(s) are necessary in the ADA Tracking System.

a.      If the ADA Unit determines that an inmate requires a Mobility Device, the County shall issue it consistent with Section IV.D.1, and the ADA Unit will issue to the inmate appropriate documentation authorizing possession of a Mobility Device.

b.      If the ADA Unit determines that an inmate requires a reasonable modification related to their housing assignment (e.g., ADA Accessible cell, grab bars, dining areas, showers, path of travel, lower bunk, lower tier and/or a housing reassignment in order to access work, educational or other programs), the inmate shall receive the reasonable modification within 24 hours.

3.      If the ADA Unit determines that an inmate's Mobility Disability requires evaluation from a Medical Provider, the ADA Unit shall offer an inmate a reasonable modification on a temporary basis pending a medical appointment, which shall occur within 30 days.

4.      The Parties agree that not all Mobility Disabilities and/or reasonable modifications will require an appointment with a Medical Provider to verify the Mobility Disability and/or the need for a reasonable modification.  Further, an inmate's Mobility Disability and/or need for a reasonable modification could change over time and will be addressed based on an inmate's current status.

E.      *Medical Provider's Responsibilities*

1.      If the ADA Unit refers an inmate for evaluation pursuant to Section III.D.3, or if an inmate or Medical Provider first identifies a Mobility Disability at a medical encounter where the Medical Provider is able to assess the Mobility Disability, the Medical Provider shall verify whether the inmate has a Mobility Disability and/or determine what reasonable modification(s) are necessary for the inmate unless such a determination requires a specialist-medical appointment.

a.      If the Medical Provider determines that an inmate requires a Mobility Device, the County shall issue it consistent with Section IV.D.1, and the County will issue to the inmate appropriate documentation authorizing possession of a Mobility Device

b.      If the Medical Provider determines that an inmate requires a reasonable modification related to their housing assignment

(e.g., ADA Accessible cell, grab bars, dining areas, showers, path of travel, lower bunk, lower tier and/or a housing reassignment in order to access work, educational or other programs), the inmate shall receive the reasonable modification within 24 hours.

c.    The County shall document the Medical Provider's determination in the ADA Tracking system and refer the inmate to the ADA Unit for follow-up.

d.    If the Medical Provider determines that an inmate requires a specialist-medical appointment, the Medical Provider shall promptly request that appointment, and shall consult with the ADA Unit in order to provide a reasonable modification, such as a Mobility Device and/or a housing change in accordance with Sections III.E.1.a and III.E.1.b on a temporary basis pending the outcome of the specialist-medical appointment.

2.    If an inmate or Medical Provider first identifies a Mobility Disability at a medical or mental health appointment where the Medical Provider cannot assess the Mobility Disability (e.g., because the appointment is not conducted by the appropriate Medical Provider and/or is scheduled for a different purpose), the Medical Provider shall refer the inmate to the ADA Unit, and the County shall document the referral in the ADA Tracking System.  The ADA Unit shall then conduct a review consistent with Section III.

3.    Medical Providers evaluating an inmate's Mobility Disability and/or the need for a reasonable modification(s) may determine at an in-person evaluation that the inmate does not have a Mobility Disability and/or the inmate does not require a reasonable modification.  If such a determination is made, the County shall document the rationale for the Medical Provider's finding in the ADA Tracking system.

## IV.  ISSUANCE, RETENTION, MAINTENANCE, AND DENIAL OF MOBILITY DEVICE(S)

A.    The County's policies and procedures for the ordering, retention, maintenance, and denial/confiscation of Mobility Devices shall be reviewed and amended or drafted, as necessary to be consistent with this Remedial Plan.

B.    Supply and Maintenance of Standard Mobility Devices

1.      The County shall maintain a reasonable supply of Standard wheelchairs, walkers, canes, and crutches.

2.      The County shall inspect its supply of Standard Mobility Devices on a quarterly basis to ensure sufficient operational quantities are available.

C.      *Motorized Mobility Devices*

1.      Motorized Mobility Devices are generally not permitted in the Jails.

2.       The ADA Unit and Medical Provider(s), in coordination with the Assistant Sheriff, shall determine the most appropriate manner to accommodate an inmate who requires a motorized Mobility Device in the exceptional circumstance where a Medical Provider or the ADA Unit have determined, as outlined in Section III, that a motorized Mobility Device is the only reasonable modification that would meet the needs of the inmate with a Mobility Disability.

3.      The County shall consult with Plaintiffs' Counsel if the County determines that it will accommodate the inmate in need of motorized Mobility Device in some other manner than permitting the inmate to utilize the motorized Mobility Device in the Jail.

D.      *Timing for Issuance of Mobility Devices*

1.      An inmate with a Mobility Disability in need of a Standard Mobility Device shall be issued a Standard Mobility Device within four (4) hours, absent extenuating circumstances, following the ADA Unit or the Medical Provider's determination that an inmate needs a Mobility Device.

2.      Generic or Customized Mobility Devices may take time to order or design.  If the required Generic Mobility Device is available on site, it shall be issued within four (4) hours, absent extenuating circumstances, following the ADA Unit or the Medical Provider's determination that an inmate needs a Mobility Device.  For Customized Mobility Devices and Generic Mobility Devices not kept on site, Adult Custody Health Services shall either obtain the device or, if the device requires a special order, place the order for said device within three (3) business days of identification of need. The County shall inform the inmate of an estimated time that the Generic and/or Customized Mobility Device shall be provided.  The County shall check on the status of the Generic or Customized

Mobility Devices every 30 days and shall provide the inmate with a temporary reasonable modification to the extent necessary.

E.   *Maintenance of Mobility Devices*

1.   If an inmate's Mobility Device is operable but in need of maintenance or repair, and the inmate notifies the ADA Unit, the ADA Unit shall assess and address the maintenance or repair need within seven (7) days.

2.   If an inmate's Standard Mobility Device becomes inoperable and the inmate reports the problem to custody staff, the County shall provide a replacement within twenty-four (24) hours.

3.   If an inmate advises the ADA Unit and/or a Medical Provider that a Generic or Customized Mobility Device is in need of maintenance, repair, or replacement, the County shall coordinate maintenance, repair, or replacement as necessary.  In the interim, the ADA Unit shall replace the Generic Mobility Device if such device is kept in stock on site or provide the inmate with a Standard Mobility Device on a temporary basis and evaluate the provision of other interim reasonable modification(s).

F.   *Safety-Security Assessments After Intake*

1.   The County shall permit an inmate to keep a Mobility Device unless a Captain or Watch Commander determines and documents, based on a Safety-Security Assessment, that a Mobility Device constitutes an immediate risk of bodily harm to inmates or staff, or threatens the security of the facility.

2.   If the Captain or Watch Commander makes such a determination, they shall document the decision, and reasons for it, as well as the date of decision, in writing, and shall promptly consult with a Medical Provider and the ADA Coordinator to determine if an appropriate alternative reasonable modification can be provided, in which case an alternative reasonable modification shall be provided. The Captain, Watch Commander, Medical Provider, or ADA Coordinator shall document the nature of any alternative reasonable modification(s) provided in the ADA Tracking System.

3.      If the County removes an inmate's Mobility Device following a Safety-Security Assessment, the County shall reevaluate the Safety-Security Assessment as follows:

a.      The inmate must be reevaluated by the ADA Unit to determine if he or she can safely possess the Mobility Device a minimum of every seven (7) days if the device is removed during the intake process.

b.      The inmate must be reevaluated by the ADA Unit to determine if he or she can safely possess the Mobility Device a minimum of every fourteen (14) days if the device is removed at any other time.

c.      For each evaluation pursuant to Section IV.F.3.a and IV.F.3.b, the ADA Unit shall make a recommendation to the Captain of the facility or his or her superiors regarding whether the Mobility Device should continue to be removed from the inmate and shall document the rationale in the ADA Tracking System.

4.      Notwithstanding the provisions above, the County acknowledges its obligations to comply with California Penal Code section 2656 pertaining to retention of orthopedic and prosthetic appliances.

## V.      CLASSIFICATION AND HOUSING OF INMATES WITH MOBILITY-DISABILITIES

A.      The County shall review its Classification Policies and Procedures and revise, as necessary, to be consistent with this Remedial Plan.

B.      An inmate's need for a Mobility Device in a housing unit shall not be a basis for assignment to the infirmary, a medical unit, or a mental health housing unit.

C.      That an inmate has a Mobility Disability and/or requires reasonable modifications for that disability (including the provision of Mobility Devices) shall not be a factor in determining an inmate's security classification.

D.      Inmates identified as having a Mobility Disability shall be placed in housing that is consistent with their security classification and their accessibility needs.  Not all inmates with a Mobility Disability require an ADA Accessible cell or unit, but may require reasonable modifications

related to housing such as, but not limited to, a lower bunk/lower tier assignment, or access to ADA Accessible shower facilities.

E.   This Remedial Plan recognizes that, while additional ADA Accessible housing is constructed pursuant to the Construction Remedial Plan (Section XI), ADA Accessible housing may not be immediately available for every inmate needing such housing consistent with their classification. As ADA Accessible housing is completed and brought online under the Construction Remedial Plan, inmates in need of ADA Accessible housing shall be housed consistent with their needs. In the interim, the Parties agree that inmates with Mobility Disabilities who require ADA Accessible housing shall be housed as follows:

1.   Male Inmates

a.   Inmates determined to be a Level 1 classification shall be housed in Barracks 3 at the Elmwood Minimum Camp unless Barracks 3 is closed for repairs, construction, or other extenuating circumstances, in which case these inmates shall be housed in Special Housing.

b.   Inmates who use wheelchairs, and who are determined to be Level 2, 3, 4 security level inmates, shall be housed in Main Jail Unit 2B and/or Elmwood Unit M3.

c.   Inmates who use Mobility Devices other than wheelchairs and who are determined to be Level 2, 3, or 4 security level inmates, shall be assessed on an individualized basis and housed as appropriate.

2.   Female Inmates

a.   Inmates who can be appropriately housed in a dorm setting based on their security level shall be housed in W2. The ADA Unit will promptly conduct an individualized assessment to determine if additional reasonable modification(s) are necessary and develop a plan to address those needs.

b.   Inmates who require cell-style housing based on their security level shall be housed in W4. The ADA Unit shall promptly conduct an individualized assessment to determine if additional reasonable modification(s) are necessary and develop a plan to address those needs. The County shall

promptly consult with Plaintiffs' Counsel regarding the County's planned reasonable modifications for an inmate requiring cell-style housing who, the County has determined as outlined in Section III, requires full-time use of a wheelchair.

F.      If the housing units listed in Sections V.E.1 and/or V.E.2 are closed for repairs, construction, or other extenuating circumstances, the County shall promptly (1) notify Plaintiffs' Counsel of the closure(s), and (2) provide Plaintiffs' Counsel with a list of where inmates with Mobility Disabilities will be housed for the duration of the closure(s).  During such closure(s), the ADA Unit shall promptly conduct an individualized assessment to determine if additional reasonable modifications are necessary for the affected inmates with Mobility Disabilities and develop a plan to address those needs.

## VI.   TRACKING INMATES WITH MOBILITY DISABILITIES ("ADA TRACKING SYSTEM")

A.      The County shall use an ADA Tracking System to document and share internally information regarding inmates with Mobility Disabilities.

B.      The ADA Tracking System shall identify and track all inmates with a Mobility Disability.

C.      The ADA Tracking System shall have the following functional capabilities:

1.      Code the type of Mobility Disability and the reasonable modifications an inmate requires for the Mobility Disability (e.g., Mobility Devices, lower bunks, ground floor housing).

2.      Track all programs, services, and reasonable modifications offered to an inmate with a Mobility Disability throughout his/her incarceration.

D.      The County shall designate staff that shall be responsible for using the ADA Tracking System.  Designated Staff shall include Classification Staff, the ADA Coordinator and his or her staff, the Facility Watch Commander, Division Commander, Administrative Sergeant, Program Managers, and staff from Adult Custody Health Services ("Designated Staff").

E.      Designated Staff, both during the intake and booking process and during clinical encounters, shall be responsible for adding or modifying

information regarding the nature of an inmate's Mobility Disability and necessary reasonable modifications for that Mobility Disability.

F.   Designated Staff shall be able and expected to view information in the system to ensure that the County provides reasonable modifications to inmates with Mobility Disabilities.

G.   Designated Staff shall also be responsible for updating the system with information regarding the reasonable modifications provided during the inmate's incarceration and any subsequent returns to custody.

H.   Housing unit, education, and program office staff shall be provided with a report listing all inmates with a Mobility Disability in the relevant unit or program, as well as those inmates' needing reasonable modifications for a Mobility Disability.  The report shall be updated and provided in written form to such staff at least once per week.  Additionally, information from the report shall be communicated in writing to staff whenever an inmate with a Mobility Disability is assigned to the unit or program.

I.   All Designated Staff shall be trained to properly use the ADA Tracking System.  The training shall occur on site over the course of six months after implementation begins.

J.   The County shall develop and maintain appropriate policies outlining who can access and modify information in the ADA Tracking System.

## VII.   PROGRAMS AND SERVICES

A.   The County's policies and procedures pertaining to programs and services shall be reviewed and amended or drafted, as necessary, to be consistent with this Remedial Plan.

B.   The County shall ensure that an inmate with a Mobility Disability has equal access to all inmate programs and services for which an inmate would be eligible but for that Mobility Disability—including, but not limited to educational, vocational, work, recreational, visiting, medical, mental health, substance abuse, self-improvement, and religious programs, as well as early release programs such as the Custody Alternative Supervision Program (CASP)—on a space available basis, consistent with the inmate's security classification.

C.   If an inmate's Mobility Disability interferes with his or her ability to participate in a program or service for which he or she is otherwise eligible, the ADA Coordinator shall first determine whether the individual inmate

can participate in the program or service if the County provided a reasonable modification. If a non-structural reasonable modification will allow an inmate with a Mobility Disability to participate in a program, the County shall provide the non-structural reasonable modification and shall allow the inmate to participate in the program.

D.    If a non-structural reasonable modification would result in a fundamental alteration of the program, the County must take actions that would not result in such an alteration but would nevertheless ensure that the inmate with a Mobility Disability receives the benefits or services offered by the County's program.

E.    The County can refuse to provide a reasonable modification to an inmate with a Mobility Disability who is otherwise qualified for a program or service if: (1) the inmate's participation in the program would pose a direct threat to the health or safety of others, or (2) there is a reason for doing so that is reasonably related to a legitimate penological interest(s), as determined by the ADA Unit in coordination with the Assistant Sheriff. Refusal to provide a reasonable modification pursuant to either of the preceding exceptions shall be based on a Safety-Security Assessment. If providing an alternative Mobility Device would mitigate the risk, the County shall provide the inmate with the designated alternative as expeditiously as possible.

F.    If the County relies upon any of the above exceptions to deny an inmate with a Mobility Disability the opportunity to participate in a program or service, the ADA Unit must document the basis for the determination in the ADA Tracking System.

G.    *Location of Programs and Services*

      1.    The Parties have designated structural changes in the Construction Remedial Plan outlined in Section XI in order to provide program accessibility to inmates with Mobility Disabilities.

      2.    In order to address program accessibility, the County agrees to provide programming and services in the areas designated in the Construction Plan (Section XI) as the portions of the Construction Plan providing accessibility to programs and services are completed.

      3.    As an alternative to providing programming and services in areas designated in the Construction Plan, the County may continue to utilize nonstructural methods to provide accessibility to programs and services, including but not limited to acquisition or redesign of

equipment, assignment of aides to inmates with Mobility Disabilities or, at the County's election, the provision of services at alternate accessible sites.

4.      While the County is undertaking the construction described in Section XI of this Remedial Plan, the Parties agree that the County shall take the following interim measures to provide accessibility to programs and service for inmates with Mobility Disabilities:

   a.      The County may use inmates or Custody Staff to push inmates in wheelchairs to a program or service along paths of travel agreed upon by the Parties.  Pending completion of physical modifications to the paths of travel, wheelchair pushers may be used as an interim measure.  Wheelchair pushers used on an interim basis are subject to the training requirements and other provisions outlined in Section VII.G.7.

   b.      Assignment of aides to inmates with Mobility Disabilities.

5.      Where the County cannot provide programs or services at the locations designated in the Construction Plan and cannot find nonstructural measures to provide accessibility to programs and services, the County may refuse to provide the program or service to an inmate with a Mobility Disability only upon a showing that doing so would result in a fundamental alteration in the nature of the program, service, or activity, or would result in undue financial and administrative burdens.

6.      The County shall maintain ADA Accessible facilities in operable working condition.  Isolated or temporary interruptions in access to these facilities due to maintenance or repairs are not prohibited if the County is exercising reasonable diligence in addressing the maintenance or repairs.

7.      Once paths of travel are made compliant with this Remedial Plan, wheelchair pushers may continue to be used for inmates who need assistance traveling long distances, unless otherwise requested by the inmates.  Appropriately screened inmates and/or Custody Staff chosen to assist inmates who use wheelchairs shall receive initial and periodic training as to their job duties and performance criteria. The training shall cover how to safely and properly assist inmates with Mobility Disabilities.  The ADA Unit shall evaluate wheelchair

pushers which shall include feedback from the inmates with Mobility Disabilities.  Inmates with Mobility Disabilities have the right to refuse a wheelchair pusher, and in that circumstance, the ADA Unit shall determine an appropriate alternative reasonable modification.

H.      If an inmate with a Mobility Disability requires transportation in a vehicle—e.g., to court or to a medical appointment at an outside facility— the vehicle used to transport the inmate must be ADA Accessible. Specifically, inmates who use wheelchairs on permanent bases and/or inmates who have difficulty navigating steps without assistance must be transported in vehicles equipped with a wheelchair lift and other safety equipment mandated by the Department of Motor Vehicles and the Department of Transportation.  If the Department of Motor Vehicles and Department of Transportation standards conflict, the applicable standard that provides greater protections to individuals with a Mobility Disability shall govern.

## VIII.  POLICY REVIEW AND REVISION

A.      The County is reviewing and revising, as needed, all policies, procedures, Post Orders, and forms, including those for Adult Custody Health Services, and the Inmate Orientation book, to be consistent with the provisions in this Remedial Plan.  Plaintiffs' Counsel shall be provided the opportunity to comment on these documents.

B.      *Policy Revision Process*

1.      Within 30 days of the execution of the Consent Decree, the Parties shall meet and confer to designate the policies that require revision to address key portions of this Remedial Plan

2.      The County shall provide Plaintiffs' Counsel with draft proposed revisions to the agreed upon policies within 120 days of the execution of the Consent Decree unless a longer timeframe is mutually agreed upon by the Parties.

3.      The designated policies shall be finalized with one year of the execution of the Consent Decree unless the Parties agree to a longer time frame.

C.      The County shall train relevant Staff on new or revised policies and procedures as detailed in Section X.

## IX.   ADA COORDINATOR

A.   The County has appointed a full-time ADA Coordinator, a lieutenant who reports directly to the Assistant Sheriff.  The ADA Coordinator shall oversee all issues related to inmates with Mobility Disabilities, including, but not limited to, classification; housing; inspection, maintenance, provision, and removal of Mobility Devices; and responding to Mobility Disability-related requests and inmate grievances pursuant to County policy.

B.   The County shall not modify the job description of the ADA Coordinator without consultation with Plaintiffs' Counsel.

C.   As soon as practical, but under no circumstances more than ninety (90) days after an inmate has been identified as having a Mobility Disability, the ADA Coordinator and/or her or his staff shall personally meet with each new inmate housed in the Jail who is identified as having a Mobility Disability.  The meeting with the ADA Coordinator shall be for the purpose of ensuring that the inmate is housed in a cell and unit that accommodates his or her Mobility Disability; has the appropriate Mobility Device(s) and/or other reasonable modifications; ensuring the inmate has equal access to Jail programs for which she or he is eligible but for his or her Mobility Disability; ensuring the inmate has access to grievance forms to raise disability-related issues; and to advise the inmate of personnel who can assist her or him with reasonable modification needs.  For an inmate identified as having a Mobility Disability who remains in the Jails for more than six (6) months, the ADA Coordinator and/or her/his staff shall meet with the inmate at least once every six (6) months until the inmate is released from the Jail.

D.   The ADA Coordinator is charged with facilitating ADA Mobility-Disability related training to Custody Staff and Adult Custody Health Services Staff, and with monitoring programs and work assignments to ensure meaningful access for all inmates with Mobility Disabilities.  The ADA Coordinator shall have sufficient staffing (the "ADA Unit") to assist him or her regarding Mobility-Disability issues.

E.   During any period where the ADA Coordinator is unavailable for more than thirty (30) days, a sergeant or higher-ranked individual shall fulfill the duties of the ADA Coordinator position until the ADA Coordinator becomes available or a replacement is appointed to the position.

Santa Clara County ADA Remedial Plan Page 15

F.      The ADA Coordinator shall attend and complete a certificate-course designed for ADA coordinators and obtain a certification and maintain said certification with updates and continuing education courses.  Any replacement ADA Coordinator or interim ADA Coordinator shall obtain his or her ADA certification within twelve (12) months of starting in the position.

## X.      TRAINING

A.      The County provided eight (8) hours of mutually agreed upon ADA training to all DOC Academy Cadets, Custody Staff, and Adult Custody Health Services Staff members in 2015 and 2016.

B.      *Training on New Policies and Procedures*

1.      Within six (6) months of the finalization of the revised policies and procedures (see Section VIII), the Parties shall select a mutually agreed upon trainer to train on the revised policies and procedures. Within the same six (6) month period, the selected trainer shall develop a curriculum for training Custody and Adult Custody Health Services Staff on the revised policies and procedures.  The trainer shall then train Custody and Adult Custody Health Services Staff as outlined in Sections X.C.2 and X.D.2.

2.      Within nine (9) months of the trainer's preparedness to conduct the training, the trainer shall train 90 percent of Custody and Adult Custody Health Services Staff, and make reasonable efforts to train all Custody and Adult Custody Health Services Staff, on new policies and procedures or revised policies and procedures adopted pursuant to relevant topics in this Agreement.  Critical Staff, such as the ADA Coordinator, ADA Unit, Intake Staff, and Medical Providers shall be prioritized for training during the first three months.

C.      *On-Going Training to Custody and Adult Custody Health Services Staff*

1.      The County shall provide eight hours of ADA training to all DOC Academy classes.

2.      After completion of the training in Section X.B, the County shall provide a biennial training by a mutually agreed upon trainer to train Custody and Adult Custody Health Services Staff.

D.    The County may engage a consultant to provide one 24-hour Train the Trainer (T4T) ADA training to prepare the County to take over the responsibility of providing ongoing ADA training and the responsibility of providing biennial refresher training.

E.    The appropriate length, format, and method of the training for Staff, including different types of Staff, will be developed in consultation with Plaintiffs' counsel.  Plaintiffs' Counsel shall have the right to comment on all of the above-listed training modules in advance of their roll-out and to observe any of the aforementioned trainings upon request.

## XI.    FACILITY MODIFICATIONS AND ADJUSTMENTS

A.    *Facilities*

1.    The County currently has two jail facilities:

a.    Main Jail (presently, Main Jail North and South).

b.    Elmwood (presently, Elmwood Correctional Center for Men and Correctional Center for Women).

2.    The County intends to build a new jail ("New Jail").  However, if the County determines it will not build the New Jail, the parties will meet and confer within thirty (30) days of such determination to discuss any additional construction that may be necessary at the Jails to meet the needs of inmates with Mobility Disabilities.

3.    The County shall not house inmates with Mobility Disabilities at Main Jail South or Elmwood W1.

4.    The County shall maintain ADA Accessible features required by this Agreement in operable working condition.  This requirement does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

B.    *New Jail*

1.    The New Jail shall be constructed in accordance with all applicable construction requirements under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and California Government Code Section 11135 ("Section 11135").

2.      The New Jail shall include at least three percent ADA Accessible cells or 20 ADA Accessible cells, whichever is greater.  The New Jail will provide housing for Level 2 and 3 inmates at a minimum.

C.     *Main Jail North*

1.      Booking Area (Basement Level):  The County shall make the following ADA Accessible:

a.      One transaction counter for men;

b.      One transaction counter for women;

c.      One single occupancy holding cell for men;

d.      One multiple occupancy holding cell for men;

e.      One dress out area, including shower;

f.      One television shelf in the general occupancy classification holding cell;

g.      One mirror for inmate use; and

h.      One pay telephone for inmate use.

i.      The Parties agree that in lieu of making one holding cell for women ADA Accessible, the County shall use the dress out area in the bathroom/shower for women with Mobility Disabilities.

2.      Property Release Area:  The County shall make the following ADA Accessible:

a.      One transaction counter; and

b.      One bench in holding room.

c.      The Parties agree that in lieu of making the property release area restroom ADA Accessible, the County shall provide access, immediately upon request, to a restroom located in the lobby.

3. <u>Second Floor</u>:

    a.   <u>General Use Area and Medical Unit (2A)</u>:  The County shall make the following ADA Accessible:

        i.     One dental examination room;

        ii.    Remove access barriers and install a high-low table in one examination room on the unit;

        iii.   One medical waiting area cell with accessible restroom;

        iv.   The counter in one visiting cell; and

        v.    One telephone in the pro per interview room.

    b.   <u>Special Housing (2B)</u>:  The County shall make the following ADA Accessible:

        i.     Eight cells;

        ii.    One shower (excluding a fixed bench) and one bathtub;

        iii.   One table in the dayroom and one table in the multipurpose room; and

        iv.   One piece of exercise equipment.

        v.    The Parties agree that in lieu of providing fixed benches in ADA Accessible showers, the County shall adopt a policy of providing a safe and secure shower chair which shall be readily accessible and provided immediately upon request to an inmate with a Mobility Disability.

    c.   <u>Infirmary (2C)</u>:  The County shall make the following ADA Accessible:

        i.     Two dorms with a combined minimum of 8 beds;

        ii.    Eight cells;

        iii.     One shower (excluding a fixed bench) and one bathtub;

        iv.     One table in the dayroom and one table in the multipurpose room;

        v.     Call buttons; and

        vi.     One piece of exercise equipment.

        vii.     The Parties agree that in lieu of providing fixed benches in ADA Accessible showers, the County shall adopt a policy of providing a safe and secure shower chair which shall be readily accessible and provided immediately upon request.

4.    <u>Fourth and Fifth Floor Housing Units</u>:  The County shall make the following ADA Accessible:

    a.     Five cells on the 4th floor;

    b.     Five cells on the 5th floor;

    c.     The counter in one visiting room on the 4th floor;

    d.     The counter in one visiting room on the 5th floor;

    e.     One shower serving each of the designated housing units on the 4th floor;

    f.     One shower serving each of the designated housing units on the 5th floors;

    g.     One table in the dayroom serving each of the designated housing units on the 4th and 5th floors;

    h.     One table in the multipurpose room serving each of the designated housing units on the 4th and 5th floors;

    i.     One payphone and one mirror in the dayrooms serving each of the designated housing units on the 4th and 5th floors; and

    j.     One piece of exercise equipment.

5.    Eighth Floor (Mental Health/Special Management Housing):  The County shall make the following ADA Accessible:

a.    The door threshold of the Seclusion/Safety cell;

b.    Four cells in 8A and one cell in 8B;

c.    One shower with flip-down shower bench serving each of the designated housing units;

d.    One table in the dayroom serving each of the designated housing units;

e.    One table in the multipurpose room serving each of the designated housing units;

f.    One payphone and one mirror in the dayrooms serving each of the designated housing units; and

g.    One piece of exercise equipment.

h.    The Parties agree that in lieu of providing additional ADA Accessible cells on 8A, the County shall adopt a policy that shall require that an inmate with a Mobility Disability, who otherwise would be housed on 8A, be transferred to the County hospital if there is not appropriately accessible housing for the inmate's needs on 8A.

i.    The Parties also agree that in lieu of providing additional ADA Accessible cells on 8B, the County shall adopt a policy that shall require that an inmate with a Mobility Disability, who otherwise would be housed on 8B, shall be housed in another appropriate accessible housing unit at the Jail and shall be provided with services equivalent to what the inmate would have received in 8B in that housing unit.

D.    *Elmwood Facility*

1.    General:

a.    The County shall install ADA Accessible water fountains in housing areas, program areas, and along paths of travel utilized by inmates with Mobility Disabilities.

b.    <u>Paths of Travel</u>:  The County agrees to make the Paths of Travel used by inmates with Mobility Disabilities affixed as Attachment 1 ADA Accessible.

c.    <u>Processing Area</u>:  The County shall make the following ADA Accessible:

    i.    One restroom; and

    ii.    Dress out area for male and female inmates.

    iii.    The Parties agree that in lieu of making the holding cells ADA Accessible, the County shall adopt a policy of placing an inmate with a Mobility Disability outside of the holding cells either on or next to the seating area and shall ensure that the inmate with a Mobility Disability is moved directly to housing, limiting the amount of time in the processing area.

    iv.    The Parties agree that in lieu of making the showers ADA Accessible, the County shall not use the showers unless needed for decontamination or biohazard cleanup in the rare circumstance where contamination or biohazard incident occurs in the immediate area, in which case the inmate shall be offered appropriate assistance.  An inmate with a Mobility Disability has the right to refuse assistance, in which case the inmate shall be transported to an alternative ADA shower for decontamination.

d.    <u>Information Center</u>:  The County shall make the following ADA Accessible:

    i.    The counter; and

    ii.    One restroom.

    iii.    The Parties agree that the room for attorney visits located in the Information Center shall have a small table to allow sufficient clearance space for an inmate with a Mobility Disability.  The County agrees to provide a small table and maintain sufficient clearance space at all times.

e.    <u>M1 – (Upper Floor)</u>:  The County shall make eight cells ADA Accessible to house men and/or women.

f.    <u>Medical Facility</u>:  The County shall make the following ADA Accessible:

    i.    The restroom serving the waiting area.

    ii.    The Parties agree that in lieu of installing a bench in the X-ray changing room, the County shall adopt a policy of providing a chair for an inmate with a Mobility Disability.  The County further commits to ensuring all movable furniture shall not be placed in paths of travel.

2.    <u>Elmwood Men's</u>

a.    Operations Facilities:  The County shall make the following ADA Accessible:

    i.    The counter located in the library;

    ii.    One restroom in the workshop area;

    iii.    One restroom near the classrooms;

    iv.    The threshold to classroom doors except that the County is not required to modify the cross-slope of the walkway that abuts the classrooms; and

    v.    Table or work bench where used by Mobility Impaired inmates.

b.    <u>Men's Minimum Security Housing (Level 1 Dorm-Style Housing)</u>:  The County shall make the following ADA Accessible**:**

    i.    Twenty-five beds spread across at least two different housing units;

    ii.    The entryway/ramps to the housing units;

    iii.    One shower and restroom serving the designated housing units; and

      iv.     One table in the designated housing units.

c.    <u>Men's Dining Hall for Minimum Security (Level 1) Inmates</u>: The County shall make the following ADA Accessible:

      i.     Five percent of the seating capacity; and

      ii.     One ADA-designated portable toilet that meets California Building Code 11B-603 outside the dining hall.

d.    <u>Men's Recreation Yard for Minimum Security (Level 1) Inmates</u>:  The County shall make the following ADA Accessible**:**

      i.     Handrails on the path to the volleyball court;

      ii.     Paved route from ADA housing unit(s) to the handball courts and basketball courts, or paved route from ADA housing unit(s) to and around the perimeter of the field; and

      iii.     One piece of exercise equipment.

e.    <u>Men's Medium Housing (Level II and III Inmates)</u>:  The County shall make the following ADA Accessible:

      i.     <u>Cell-Style Housing at M4 and/or M5</u>:

          (1)     Four cells in a minimum of two different cell-style housing units;

          (2)     One shower serving each of the designated housing units;

          (3)     One dayroom table serving each of the designated housing units;

          (4)     Cane detectable railing serving each of the designated housing units;

          (5)     Remove access barriers and install a high-low table in one examination room on the housing unit; and

(6)     One piece of exercise equipment.

(7)     The Parties agree that in lieu of providing additional ADA Accessible cells in M4 and/or M5, the County shall adopt a policy that shall require that an inmate with a Mobility Disability, who otherwise would be housed on M4 and/or M5, shall be housed in ADA Accessible dorm-style housing at the same security level or lower.

ii.     <u>Dorm-Style Housing Units in M3 and/or M8</u>

(1)     Twenty-five beds spread across at least two different housing units;

(2)     One restroom serving each of the designated housing units;

(3)     One shower serving each of the designated housing units;

(4)     One dayroom table serving each of the designated housing units;

(5)     Cane detectable railing serving each of the designated housing units;

(6)     Remove access barriers and install a high-low table in one examination room on the unit;

(7)     One piece of exercise equipment; and

(8)     One holding cell in M8.

3.     <u>Elmwood – Women's</u>

a.     <u>W-2 Dorm Style Housing for Minimum and Medium (Level 1 and 2 Inmates)</u>:  The County shall make the following ADA Accessible:

i.     Eight beds in a minimum of two different housing units;

ii.     One restroom serving the housing units;

iii.    One shower serving the designated housing unit;

iv.    One table serving the designated housing unit;

v.    Cane detectable railings in designated housing unit; and

vi.    One piece of exercise equipment.

b.    <u>W-4 Cell-Style Housing Medium and Maximum Security Inmates (Level II, III, and IV Inmates)</u>:  The County shall make the following ADA Accessible:

i.    Four cells in two different housing units;

ii.    One restroom serving the designated housing units;

iii.    One shower serving the designated units;

iv.    One table serving the designated units;

v.    Cane detectable railings in designated units;

vi.    Walkway and thresholds to the yards on the designated units;

vii.    Restroom in court holding cell;

viii.    Bench in visiting area; and

ix.    One piece of exercise equipment.

c.    Level IV inmates shall not be housed in the W-1 dorm setting.

d.    <u>Modular Classrooms</u>:  The County shall make ADA Accessible any classrooms serving Elmwood Women's ADA Accessible housing, including the associated paths of travel.

## XII.   MONITORING PLAN

A.    The County shall develop a Monitoring Plan to ensure effective internal oversight and accountability procedures to comply with the non-construction related portions of this Agreement.  Plaintiffs' Counsel shall be provided the opportunity to comment on the Monitoring Plan.

B.     The County shall develop a construction schedule for the Construction Plan. Plaintiffs' Counsel shall be provided with an opportunity to comment on the plan.

## XIII. GRIEVANCE AND ADA REQUEST SYSTEM

A.     *ADA Requests*

1.     The County will provide and maintain a readily available mechanism for inmates to make a request for reasonable modifications independent of the grievance system ("ADA Request").

2.     The ADA Coordinator or a member of the ADA Unit shall review the ADA Request within seven (7) days of receipt of such a request and, where appropriate, provide the requested reasonable modification and/or begin the verification process as set forth in Section III.

B.     *Grievance System*

1.     The County shall provide and maintain an inmate grievance system that provides for prompt and equitable resolution of complaints by inmates with Mobility Disabilities who allege disability-related violations.

2.     The County grievance form shall continue to include a checkbox or similar means to identify that the request and/or grievance is ADA-related. The County shall train grievance staff to route "ADA" grievances appropriately even if the inmate who filed the grievance did not check the "ADA" checkbox.

3.     The ADA Coordinator or a member of the ADA Unit shall review all ADA-related complaints, assign an ADA-trained staff person to investigate the complaints, and/or interview the inmate to the extent his or her complaint or requested reasonable modification is unclear, and provide a substantive written response to the inmate. The total response time for all ADA-related grievances (but not appeals) shall be no more than 30 days from receipt.

4.     All ADA-related grievances and responses, including provision of interim reasonable modifications, shall be documented and tracked in the ADA Tracking System.

C.   *Expedited ADA Unit Review of Urgent ADA Requests and Grievances*

1.   The ADA Unit shall screen ADA Requests and ADA-related grievances for ADA-related issues that, if true, would subject the inmate to a substantial risk of injury or other harm, which include: (a) unauthorized removal of an inmate's Mobility Device by Custody Staff; and (b) failures to provide housing-related reasonable modifications following a determination that the inmate requires such reasonable modification.

2.   If the ADA Unit finds that the issue can be addressed through an interim modification, the ADA Unit shall provide such interim modification promptly, but in any case no later than seven (7) days from receipt of the ADA Request or Grievance.  If the risk to health or safety cannot be addressed through an interim accommodation, within seven days from receipt of the ADA Request or Grievance, the ADA Unit shall, as appropriate:  (1) confer with the Captain or his or her superior; and/or (2) arrange for a medical consultation with a Medical Provider for resolution of the ADA Request or Grievance.  The ADA Unit shall also provide written notification to the inmate of the action(s) taken within the same seven-day period.

# ATTACHMENT 1



SCC DRA_000284

# Exhibit B

## NOTICE: CLASS ACTION SETTLEMENT
### Santa Clara County Jails: Access for Persons With Mobility Disabilities

A proposed settlement has been reached in *Cole v. County of Santa Clara*, N.D. Cal. No. 5:16-cv-06594-LHK.  The *Cole* case is a federal class action lawsuit challenging access to programs, services, and activities at the Santa Clara County Jails on behalf of inmates with mobility disabilities. You are a member of this class if you have a mobility disability and are incarcerated in the County Jails.

The Court has preliminarily approved the settlement of this matter. **This notice explains the proposed settlement, how you can see it, and how you can tell the Court whether you think it is fair.**

This action does not seek money damages and none will be awarded. Nor does the proposed Consent Decree release any claims for monetary damages class members may have.

The terms of the settlement are described in a document called the Consent Decree.  The Consent Decree implements a document called the "Remedial Plan," which outlines specific conditions in the jails that the County has agreed to remedy.

Under the Consent Decree, the County will be required to develop implementation plans to reform certain policies, procedures, and practices for providing accommodations to prisoners with mobility disabilities in the Jails, including in the areas of the County's: (1) intake process; (2) verification of mobility disability process; (3) issuance, retention, and denial of mobility device(s); (4) classification and housing of prisoners with mobility disabilities; (5) tracking of prisoners with mobility disabilities and disability-related needs; (6) provision of programs and services; (7) ADA Coordinator; (8) training of custody and custody health staff; and (9) ADA-related grievance and request systems.

The Consent Decree also requires that the County undertake significant construction to remedy physical barriers at the County Jails including increasing the number of ADA-accessible cells, removing barriers in the County's booking area, medical areas, dining areas, education and

[3303182.6]

program areas, yards, and along paths of travel. The County has already begun these efforts and has allocated over $100 million dollars to ADA jail improvements. Finally, the Consent Decree requires the County to retain experts to monitor the County's implementation of, and compliance with, the Consent Decree. The Consent Decree further provides for plaintiffs' counsel to also monitor the County's compliance.

You can read about these changes in the Consent Decree.  The Consent Decree and Remedial Plan will be available in a binder in each housing unit or, alternatively, you can read the Consent Decree and Remedial Plan by completing an Inmate Request Form and asking to see a copy. Custody Staff will provide you a copy within three (3) days of your request.

You can also access the precise terms and conditions of the Consent Decree online at www.dralegal.org or www.rbgg.com, by contacting class counsel at the addresses listed below, by accessing the Court docket in this case through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California at 280 South 1st Street, Room 2112, San Jose, CA 95113.

Michelle Iorio
Disability Rights Advocates
2001 Center Street, 4th Floor
Berkeley, CA 94704
Phone: (510) 665-8644

Kara Janssen
Rosen Bien Galvan & Grunfeld LLP
50 Fremont Street, 19th Floor
San Francisco, CA 94105
Phone: (415) 433-6830

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THE CONSENT DECREE.

The Court will keep jurisdiction to enforce the requirements of this settlement. The Court will hold a hearing on the fairness of this settlement at 1:30 p.m. on March 21, 2019, before the Honorable Lucy H. Koh at the United States District Court, Northern District of California, San Jose Courthouse, Courtroom 8 - 4th Floor, 280 South 1st Street, San Jose, CA 95113.

The attorneys who brought the class action will ask the Court to have Defendants pay for their attorneys' fees and expenses for the work they have performed and will perform in the future to monitor the County's compliance.  The Consent Decree limits the attorneys' fees and expenses to $1 million for the work done so far and to $2.2 million for work that will be necessary in the future to implement the Consent Decree and for plaintiffs' counsel to monitor compliance in order to protect the rights of class members.

You may object to the proposed Consent Decree in writing. You may also appear at the Final Approval Hearing, either in person or through your attorney. If you appear through your own attorney you are responsible for paying that attorney. All written objections and supporting papers must include the case name (*Cole v. County of Santa Clara*) and case number (No. 5:16-cv-06594-LHK), as well as your name, address, and signature.  Objections must be postmarked no later than February 28, 2019, and sent to the following address:

> Clerk of the Court
> United States District Court
> Northern District of California
> 280 South 1st Street
> San Jose, CA 95113

Comments may also be submitted by filing them in person at any location of the United States District Court for the Northern District of California.

Please note that the Court can only approve or deny the Consent Decree. The Court cannot change the terms of the Consent Decree.